UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                    CRIMINAL NO. 07-341 (DSD/JSM)

    Plaintiff,

v.                                           <u>REPORT AND RECOMMENDATION</u>

RICARDO ARAGON-RUIZ,

    Defendant.

JANIE S. MAYERON, United States Magistrate Judge

The above matter came on before the undersigned upon defendant Ricardo Aragon-Ruiz's Motion to Suppress [Docket No. 8], Motion to Dismiss – Legal Invalidity of Prior Deportation [Docket No. 18], and Motion for Court Determination of Prior Conviction [Docket No. 19].[1] Lisa D. Kirkpatrick, Assistant United States Attorney, appeared on behalf of the United States of America; Bruce D. Nestor, Esq., appeared on behalf of defendant Ricardo Aragon-Ruiz, who was personally present. The matter was referred to the undersigned by the District Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b)(1)(B).

Based upon the pleadings, the pre-hearing submissions, the exhibits submitted at the hearings on November 28, 2007, and January 8, 2008, and the testimony of Special Agents Jason Richards, Ricardo Rocha, Jeffrey Benadum, Patrick Edgar, Frank Hunter, and defendant, it is recommended that defendant's Motion to Suppress [Docket

---

[1] As it is a non-dispositive motion, defendant's Motion for Determination of Prior Conviction would generally be handled in an order rather than in a report and recommendation. However, given that defendant claims that his Motion for Determination of Prior Conviction is intertwined with his dispositive Motion to Dismiss, the Court has addressed both motions in this Report and Recommendation.

No. 8] be GRANTED in part and DENIED in part, defendant's Motion to Dismiss – Legal Invalidity of Prior Deportation [Docket No. 18] be DENIED, and defendant's Motion for Court Determination of Prior Conviction [Docket No. 19] be DENIED.

## I.      MOTIONS TO DISMISS AND TO DETERMINE PRIOR CONVICTION

### A.      Factual Background

Defendant is charged with Unlawful Re-Entry After Removal in violation of 8 U.S.C. §§ 1326(a) and 1326(b)(2), and 6 U.S.C. §§ 202(3), 202(4) and 557.  Indictment, pp. 1-2 [Docket No. 7].  This charge stems from defendant's removal from the United States subsequent to a conviction for an aggravated felony, aiding and abetting second degree assault, on May 7, 2003.  Id.  Defendant is alleged to have re-entered the country without obtaining the consent of the Attorney General or Secretary of Homeland Security to reapply for admission into the United States.  Id.

Defendant is now seeking to dismiss the Indictment on the grounds that his prior removal was legally invalid.  Defendant has also moved this Court to determine that the felony conviction that underlies his removal is not an aggravated felony.  No witness testimony was presented at the hearing on these motions.  Rather, both defendant and the Government relied on exhibits submitted into evidence.  The exhibits contained the paperwork surrounding defendant's removal proceedings.  The facts obtained from these exhibits are as follows:

In March of 2003, defendant was arrested for Second Degree Assault.  Def. Ex. 1:042, 1:044[2] (Record of Deportable/Inadmissible Alien).  On March 19, 2003, he was

---

[2]      "Def. Ex. 1:__" refers to the bates stamp page number on Ex. 1.

interviewed by Special Agent Haase of ICE.  <u>Id.</u>  At that time, Special Agent Haase read

to defendant a form entitled "Notice of Rights" which provided as follows:[3]

> You have been detained because the Immigration Service believes that you are in the United States illegally. You have a right to a hearing before the Immigration Court, in order to decide whether you can stay in the United States. In the event that you request this hearing, you have the option of requesting a return to your country as soon as possible, without holding the hearing.
>
> You have the right to contact a lawyer or other legal representative to represent you at the hearing, or to respond to any questions about your rights under the law in the United States. If you request, the official who handed you this Notification will give you a list of legal associations that could represent you either free or inexpensively. You have the right to communicate with the consular service or diplomat of your country. You can use the phone to call a lawyer or other legal representative, or a consular officer at any time prior to your departure from the United States.

Def. Ex. 1:50.  Next to the paragraph that followed the preceding paragraphs, titled

"Request for Resolution," defendant placed his initials.  This paragraphs states:

> I admit that I am illegally in the United States, and do not believe that it would be dangerous to go back to my country. I waive my right to a hearing before an immigration court. I wish to return to my country as soon as they can arrange my departure. I understand that I could be held in custody until my case is settled.

<u>Id.</u>

On May 7, 2003, defendant was convicted of aiding and abetting second degree

assault pursuant to Minn. Stat. § 609.222, subd. 1.  Def. Ex. 1:033.  Defendant was

subsequently removed from the United States via a Final Administrative Removal Order

entered pursuant to 8 U.S.C. § 1228(b).  <u>Id.</u>  In order effectuate the removal, on

September 27, 2004, ICE mailed to defendant a Notice of Intent to Issue a Final

---

[3]     This exhibit was in Spanish.  No translation was provided to the Court.  The Court translated the document through an online translator service found at http://www.google.com/language_tools?hl=en.

Administrative Removal Order ("Notice of Intent or Form I-851") dated September 24, 2003,[4] along with "Form EOIR-41, FORM EOIR-33, and a list of free legal services."[5] Def. Ex. 1:036.   Attached to the Notice of Intent, was an "Addendum to Form I-851," also dated September 24, 2004, signed by Special Agent Haase.  Def. Ex. 1:039.

The Notice of Intent stated that defendant was eligible for expedited removal proceedings based on the allegations that he was not a citizen of the United States, he was a citizen of Mexico, he entered the United States near San Ysidro, California on or about October 1, 1999 without inspection, he was not lawfully admitted for permanent residence, and he had been convicted on May 7, 2003 of aiding and abetting second degree assault.  Id.   The Notice of Intent also informed defendant that pursuant to section 238(b) of the Immigration and Nationality Act, the Notice of Intent was being served upon defendant "without a hearing before an Immigration Judge."  Id.

The second page of the Notice of Intent contains two sections, one marked "I Wish to Contest and/or Request Withholding of Removal," and one marked "I Do Not Wish to Contest or Request Withholding of Removal."  Def. Ex. 1:034.   Beneath the section marked "I Do Not Wish to Contest or Request Withholding of Removal," the box next to the following paragraph was checked.  This paragraphs states:

> I admit the allegations and charge in this Notice of Intent.  I admit that I am deportable and acknowledge that I am not eligible for any form of relief from removal.  I waive my right to rebut and contest the above charges and my right to file a petition for review of the Final Removal Order.  I do

---

[4]     It appears to the Court that this date may be a typographical error and that the Notice may have dated September 23, 2004, as the second page of the document indicates that it was mailed to defendant on September 24, 2004.  Def. Ex. 1:034.

[5]     The EOIR forms are from the Executive Office for Immigration Review.   Form EOIR-41 is a Written Notice of Appeal Rights, and EOIR-33 is a Change of Address Form.  http://www.usdoj.gov/eoir/efoia/EOIRform.htm.

not wish to request withholding or deferral of removal.   I wish to be removed to _____."

Id.  In this blank, the words "Mexico (Mexico City)" are handwritten.  Id.

Immediately below that paragraph, the box was checked next to the sentence "I waive the 14 day period of execution of the Final Removal Order."  Id.  Defendant's signature is immediately below that sentence, along with the signature of a witness, Steven Briggs.  Id.[6]

The Addendum to Form I-851 stated the following:

You have the right to remain in the United States for 14 days so that you may file a petition for review of this order to the United States Circuit Court of Appeals as provided for in Section 242 of the Immigration and Nationality Act.  You may waive your right to remain in the United States for this 14-day period.  If you do not file a petition for review within this 14 day period, you will still be allowed to file a petition from outside of the United States so long as that petition is received by the appropriate U.S. Court of Appeals within 30 days of your final order of removal.

Def. Ex. 1:039.

### 1.      Motion to Dismiss

In support of his motion to dismiss, defendant argues that the expedited removal process under 8 U.S.C. § 1228(b) improperly deprived him of any opportunity to seek administrative or judicial review and that he suffered prejudice as a consequence of these improper procedures.  Def. Mem., pp. 1-6.  [Docket No.  28].  Thus, defendant is collaterally challenging the validity of his prior deportation order on grounds that it did not satisfy the requirements of 8 U.S.C. § 1326(d).  Id., pp. 4-6.

8 U.S.C. § 1228(b), titled "Removal of aliens who are not permanent residents," provides, in pertinent part:

---

[6]      Briggs, a notary public, also read the Notice of Intent to defendant.  Def. Ex. 1:034.

(1) The Attorney General may, in the case of an alien described in paragraph (2), determine the deportability of such alien under section 1227(a)(2)(A)(iii) of this title (relating to conviction of an aggravated felony) and issue an order of removal pursuant to the procedures set forth in this subsection or section 1229a of this title.

(2) An alien is described in this paragraph if the alien—

(A) was not lawfully admitted for permanent residence at the time at which proceedings under this section commenced; or
(B) had permanent resident status on a conditional basis (as described in section 1186a of this title) at the time that proceedings under this section commenced.

(3) The Attorney General may not execute any order described in paragraph (1) until 14 calendar days have passed from the date that such order was issued, unless waived by the alien, in order that the alien has an opportunity to apply for judicial review under section 1252 of this title.

(4) Proceedings before the Attorney General under this subsection shall be in accordance with such regulations as the Attorney General shall prescribe. The Attorney General shall provide that—

(A) the alien is given reasonable notice of the charges and of the opportunity described in subparagraph (C);
(B) the alien shall have the privilege of being represented (at no expense to the government) by such counsel, authorized to practice in such proceedings, as the alien shall choose;
(C) the alien has a reasonable opportunity to inspect the evidence and rebut the charges;
(D) a determination is made for the record that the individual upon whom the notice for the proceeding under this section is served (either in person or by mail) is, in fact, the alien named in such notice;
(E) a record is maintained for judicial review; and
(F) the final order of removal is not adjudicated by the same person who issues the charges.

8 U.S.C. § 1228(b).

"[A] collateral challenge to the use of a deportation proceeding as an element of a criminal offense must be permitted where the deportation proceeding effectively eliminates the right of the alien to obtain judicial review." United States v. Mendoza-

Lopez, 481 U.S. 828, 839 (1987).   The Supreme Court's decision in Mendoza-Lopez

was codified in 8 U.S.C. § 1326(d).   See United States v. Rodriguez, 420 F.3d 831, 833

(8th Cir. 2005) (recognizing § 1326(d) as a codification of Mendoza-Lopez).   The Eighth

Circuit construes Mendoza-Lopez, consistent with § 1326(d), "as barring use of a prior

deportation order in a § 1326 prosecution when '(1) an error in the deportation

proceedings rendered the proceedings fundamentally unfair in violation of due process,

and (2) the error functionally deprived the alien of the right to judicial review.'"   United

States v. Mendez-Morales, 384 F.3d 927, 929 (8th Cir. 2004) (quoting United States v.

Torres-Sanchez, 68 F.3d 227, 230 (8th Cir. 1995)).

Pursuant to § 1326(d), an alien may not challenge the validity of the deportation

order unless the alien demonstrates that "(1) the alien exhausted any administrative

remedies that may have been available to seek relief against the order; (2) the

deportation proceedings at which the order was issued improperly deprived the alien of

the opportunity for judicial review; and (3) the entry of the order was fundamentally

unfair." 8 U.S.C. §1326(d).   These three requirements are conjunctive, and a defendant

must establish all three prongs to prevail.   United States v. Fernandez-Antonia, 278

F.3d 150, 157 (2d Cir. 2002).

In support of his motion to dismiss, defendant contends that the following

circumstances effectively eliminated his right to seek administrative or judicial review

and rendered his deportation process fundamentally unfair.   While defendant was in

custody on the state assault charge, he was interrogated on March 19, 2003 by ICE

Special Agent John Haase without being provided with notice of the charges against

him or a list of free counsel as required by 8 C.F.R. § 287.3(c).   Def. Mot., p. 2.

Additionally, Special Agent Haase was the officer who both arrested and interviewed defendant; however, 8 C.F.R. § 287.3(a) requires that a separate officer interview defendant. Id. The Form I-851 was in English, and no written translation was provided to defendant, as required by 8 C.F.R. § 238.1(b)(2)(v). Def. Mem., pp. 2-3. Instead, it appears that a prison guard[7] explained the Form I-851 to defendant in the "inglish" (sic) language. Id.

On September 27, 2004, the Form I-851 was sent via Certified Mail to the warden of the Minnesota Correctional Facility in Rush City, where defendant was an inmate. Def. Mem, p. 2; Def. Ex. 1:036-37, 39. The Form states:

> You must respond to the above charges in writing to the Service . . . within 10 calendar days of service of this notice (or 13 calendar days if service is by mail). **The Service must RECEIVE your response within that time period**.

Def. Ex. 1:033. (emphasis in original). See also Def. Ex. 1:034 ("**ATTENTION: The Service at the above address must RECEIVE your response within 10 calendar days of service from the date of service of this notice (or 13 calendar days if service is by mail).**"). (Emphasis in original). The Form I-851 (and the Addendum to Form I-851) stated that it was served on "September 24, 2004 via Certified Mail."

According to defendant, the Form I-851 was not provided to him until October 9, 2004. Def. Mem, p. 2. This was 15 days after the service date stated on the Form, September 24, 2004, twelve days after the actual mailing of the Form I-851, and eleven days after the I-851 was received by the warden at Rush City. Def. Mem., p. 3; Def. Ex. 1:035-036. Since defendant did not receive the I-851 until 15 days after the service

---

[7] The Notice of Intent states that Steven P. Briggs, notary, explained the Notice to defendant. Def. Ex. 1:034.

date, he claims that he was effectively precluded from seeking administrative review. Def. Mem., p. 3.

Additionally, defendant contends that the Form I-851 did not advise him that he could challenge the legal determination that his conviction for aiding and abetting second degree assault constituted an aggravated felony as defined by 8 U.S.C. § 1101(a)(43).  Id.  The Form I-851 only stated that defendant could "rebut the charges stated above (with supporting evidence)," implying that only factual and not legal challenges to the I-851 could be made.  Id.  Furthermore, the Form I-851 did not inform defendant of the specific basis for determining that his conviction was an aggravated felony (i.e. that it was a crime of violence); it only informed him that he had been convicted of a generic "aggravated felony."  Def. Mem., p. 4.  Therefore, defendant contends that the Form I-851 failed to provide reasonable notice of the charges against him as required by 8 U.S.C. § 1228(b)(4)(A) and 8 C.F.R. § 238.1(b)(2)(i).  Id.  Finally, defendant cites to the fact that he was incarcerated and indigent at the time the administrative removal was entered as a circumstance that rendered the process fundamentally unfair.  Id.

In response to defendant's contentions, the Government argued that defendant did not satisfy the three requirements set forth in U.S.C § 1326(d) to prevail in a collateral attack, and on that basis his motion to dismiss should be denied.  See Gov't Mem., p. 5.

a.    Failure to Exhaust Administrative Remedies

The Government first argued that defendant's motion to dismiss should be denied because he failed to exhaust his administrative remedies.  Instead of responding

to the charge that he was deportable pursuant to 8 U.S.C. § 1227(a)(2)(A)(iii) because he had been convicted of an aggravated felony as defined by 8 U.S.C. § 1101(a)(43) and submitting information to rebut the charge, defendant signed that portion of the Form I-851 admitting the allegations and charge against him, admitting that he was deportable and not eligible for any form of relief of removal, waiving his right to contest and rebut his removal or defer removal, waiving his right to file a petition for review to the Court of Appeals of the Final Removal Order, and stating that he did not wish to request withholding or deferral of removal.  Gov't Mem., p. 6; see also Def. Ex. 1:034. Defendant did not explicitly address the issue of exhaustion of remedies; rather, he argued that he was effectively precluded from administratively challenging his removal because he did not receive the Notice of Intent until after the deadline for him to respond to the Notice.  Def. Mem., p. 4.

The evidence before this Court establishes that the letter sending the Form I-851 and accompanying documents was not sent until September 27, 2004, and was received at the prison where defendant was incarcerated on September 28, 2004.  Def. Ex. 1:35-36.  Critically, however, no facts or testimony were presented as to when defendant actually received the letter and its contents or when it was explained to him by Steven Briggs, the notary.  The only evidence that was presented at the hearing was that defendant signed the Form I-851 waiving his right to contest his removal proceedings on October 9, 2004, which was 15 days after the date of service stated on the Form I-851, and that the Form was received by ICE on October 13, 2004, nineteen days after the date of service stated on the Form I-851.  Def. Ex. 1:033.  Thus, based on the evidence presented in connection with this motion (and not argument of counsel),

the Court concludes that if defendant did receive the Notice of Intent prior to October 7, 2004, he did not exhaust his administrative remedies by timely responding to the Notice, and if defendant did not receive the Notice until October 9, 2004, as his counsel suggests, he was not precluded from exercising his administrative remedies, and he did not do so.   The Court reaches the first conclusion – that defendant did not timely respond to the Notice of Intent – because the executed Form I-851 was received by ICE nineteen days after the date of service, several days after the deadlines set forth in the Notice.   The latter conclusion is reached  – that defendant was not prevented from exercising his administrative remedies – because he was informed in the Notice of Intent that he could request an extension of time to respond and he never did.  See Def. Ex. 1:033 (stating in first line of the third paragraph of the section of the Notice of Intent entitled "Your Rights and Responsibilities": "In your response you may: request, for good cause, an extension of time…").

Furthermore, defendant's conduct is at odds with any argument that he was prevented from exhausting his remedies.  The Form I-851 explicitly notified defendant of his right to "seek judicial review of any final administrative order by filing a petition for review within 14 calendar days after the date such final administrative order is issued…" Def. Ex. 1:033.  Similarly, the Addendum to the Form I-851 informed defendant of his right to remain in the United States for 14 days and file a petition of review within that 14-day time period to the appropriate U.S. Court of Appeals, and his right to file such a petition from outside the United States within 30 days of his final order of removal.  Def. Ex. 1:039.  No evidence was presented that defendant filed or even attempted to file a

petition for review of the final removal order to the U.S. Court of Appeals while he was in the United States or within the 30 days after he was removed.

Where no evidence was presented to support arguments that (1) defendant did not challenge the Notice of Intent because he believed it would be futile to challenge the order after the deadline for a response had passed; (2) he was coerced into waiving his rights to challenge the Notice of Intent; or (3) he did not understand the nature of the rights available to him or what he was waiving,[8] this Court concludes that defendant has not met his burden of showing that he exhausted all of his administrative remedies or that he was prevented from doing so.  Therefore, defendant fails to meet the first prong of 8 U.S.C. § 1326(d).

b.   Deprivation of the Opportunity for Judicial Review

The second prong of § 1326(d) addresses whether the deportation proceedings at which the deportation order was issued improperly deprived the alien of the opportunity for judicial review.  Citing to 8 U.S.C. § 1252(a)(2)(C), the Government argued that defendant was not entitled to judicial review because he had been convicted of an aggravated felony.  Gov't Mem., p. 7.  Section 1252(a)(2)(C) provides

---

[8]     Defendant argued that he was not provided the I-851 Notice of Intent in Spanish and that while the certificate of service indicated that there was an interpreter, it also stated that the Notice of Intent was read to defendant in the "inglish [sic] language." Def. Ex. 1:034.  From these facts, apparently defendant would like this Court to conclude that he did not understand English.  However, no evidence was presented to the Court that defendant did not understand English or that he did not understand the explanation provided to him by Briggs, the interpreter.  In fact, at the hearing on the motion to suppress, witnesses testified that defendant understood English, and defendant, himself, testified in English.  The Court also observes that any argument that defendant unknowingly waived his right to respond to the Notice of Intent because it was not read to him in Spanish is belied by his simultaneous argument that he waived his rights because he had the requisite level of comprehension to understand that the deadline to respond to the Notice of Intent had passed.

that "…except as provided in subparagraph (D), no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in section . . . 1227(a)(2)(A)(iii). . ." However, § 1252(a)(2)(D) states that "[n]othing in subparagraph (B) or (C), or in any other provision of this chapter (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section." 8 U.S.C. § 1252(a)(2)(D). Consistent with 8 U.S.C. § 1252(a)(2)(D), the Notice of Intent and the Addendum to Form I-851 informed defendant of his right to seek judicial review of any final removal order by filing a petition for review with the appropriate U.S. Court of Appeals within 14 calendar days after the date such final administrative order was issued or within 30 days after the final order of removal if, he was outside of the country. Def. Ex. 1:033, 39.

Based on these provisions, the Court concludes that defendant was not deprived of the right to judicial review.

Defendant's reliance on <u>Gonzalez v. Chertoff</u>, 454 F.3d 813 (8th Cir. 2006), for the proposition that failure to exhaust administrative remedies precludes judicial review, is misplaced. Def. Mem., p. 4. In <u>Gonzales</u>, the Eighth Circuit held that failure to exhaust administrative remedies precluded review of an alleged procedural due process violation that would have been redressable administratively. <u>Id</u>. at 816. Recognizing that it did have subject matter jurisdiction "to review constitutional claims and questions of law" pursuant to 8 U.S.C. § 1252(a)(2)(D), even if they were unexhausted, the Eighth Circuit specifically found that it did not have jurisdiction over unexhausted claims that

concerned 'procedural errors correctable by the administrative tribunal.'" Id. (citations omitted). See also Ming Ming Wijono v. Gonzales, 439 F.3d 868, 871-72 (8th Cir. 2006) (finding court had no subject matter jurisdiction over procedural due process claim).

In this case, the claims at issue concern whether or not defendant's underlying conviction constituted an aggravated felony such that defendant was eligible for expedited deportation proceedings, an issue which is a question of law.  Thus, pursuant to 8 U.S.C. § 1252(a)(2)(D), failure to exhaust administrative remedies in this case would not have precluded judicial review of this question of law by the Eighth Circuit.[9] Defendant was free to argue to the Court of Appeals that his underlying conviction was not an aggravated felony under 8 U.S.C. § 1101(a)(43)(F), and was not deprived of that opportunity.  He simply did not pursue his judicial remedy.

The Court finds that defendant was not deprived of his opportunity for judicial review.  As such, defendant failed to satisfy the second prong of 8 U.S.C. § 1326(d).

c.    Fundamental Unfairness of the Order

The final prong under 8 U.S.C. § 1326(d) requires the Court to determine whether the entry of the deportation order was fundamentally unfair.  "An underlying removal order is 'fundamentally unfair' if: '(1) a defendant's due process rights were violated by defects in his underlying deportation proceeding, and (2) he suffered prejudice as a result of the defects.'"  United States v. Calderon-Segura, 2008 WL

_____

[9]    While defendant would not have been prevented from appealing to the Court of Appeals the underlying basis of his deportation – that he had been convicted of second degree aggravated assault – presumably, he would have been prohibited from challenging in a petition for review with the Court of Appeals the various procedural deficiencies he has raised with respect to his arrest and interview by Special Agent Haase in March 19, 2003, that ultimately lead to his deportation.

80705 (9th Cir. 2008) (quoting United States v. Ubaldo-Figueroa, 364 F.3d 1042, 1048 (9th Cir. 2004)).   Defendant contends that the following defects in his underlying proceeding rendered the process violative of his due process rights and made the process fundamentally unfair: (1) at the time of his arrest in March 2003, he was not provided with notice of the charges[10] against him or a list of free counsel as required by 8 C.F.R. § 287.3(c); (2) Special Agent Haase was the officer who both arrested and interviewed defendant, in violation of 8 C.F.R. § 287.3(a) which requires that a separate officer interview defendant; (3) he did not receive receipt the Notice of Intent on a timely basis; (4) the Form I-851 did not advise him that he could challenge the legal determination that his conviction for aiding and abetting second degree assault constituted an aggravated felony as defined by 8 U.S.C. § 1101(a)(43), instead implying that only factual and not legal challenges to the I-851 could be made; (5) the Form I-851 did not inform defendant of the specific basis for determining that his conviction was an aggravated felony (i.e. that it was a crime of violence); it only informed him that he had been convicted of a generic "aggravated felony;" and (6) he was incarcerated and indigent at the time the administrative removal.   Def. Mem., pp. 2-4.   Defendant further argues that he suffered prejudice from the erroneous entry of the Final Administrative Order of Removal because it deprived him of an opportunity to seek voluntary departure.   Def. Mem., p. 5.

The Court finds that none of these actions, individually or collectively, rendered the removal order fundamentally unfair or caused defendant prejudice.

---

[10]   It is unclear whether defendant is referencing charges related to his violation of immigration laws or the charges related to his arrest for assault.

Regarding defendant's contention that there is no record of whether he was provided with notice of the charges against him or a list of free counsel when he was interrogated on March 19, 2003 by Special Agent Haase, while he was in custody at the Hennepin County Jail, the evidence before the Court suggested otherwise.  At the time of his interview, Special Agent Haase read to defendant the Notice of Rights Form.  Def. Ex. 1:050.  Special Haase informed defendant that he had "been detained because the Immigration Service believes that you are in the United States illegally."  Id.  In addition, defendant was told that he had the right to contact a lawyer, and that if he requested, Special Agent Haase would provide him with a list of lawyers that could represent defendant for free or inexpensively.  Id.  Defendant offered no evidence to contradict these facts.[11]

Similarly, the Court rejects defendant's contention that because Special Agent Haase was the officer who both arrested and interviewed defendant with respect to his immigration violations, contrary to the requirements of 8 C.F.R. § 287.3(a), somehow his removal was fundamentally unfair.  Again no evidence was presented to the Court to establish that defendant was both arrested and interviewed by Special Agent Haase.  However, even if that were the case, 8 C.F.R. § 287.3(a) also states that "[i]f no other qualified officer is readily available and the taking of the alien before another officer would entail unnecessary delay, the arresting officer, if the conduct of such examination is a part of the duties assigned to him or her, may examine the alien."  Even assuming

---

[11]     The Court does note that as of March 18, 2003, defendant was represented by an attorney named Julia Inz.  See Gov't Ex. 4 (Petition to Enter Plea of Guilty).  In this Petition, defendant represented that his attorney had told him that if he was not a citizen of the United States, "conviction of a crime could lead to deportation, exclusion from admission to the U.S.A., or denial of naturalization."  Id.

that Officer Haase arrested and interviewed defendant, the Court does not find that his dual role rendered defendant's removal order fundamentally unfair.

As to defendant's argument that the untimeliness of his receipt of the Notice of Intent precluded administrative review of ICE's intention to remove him, as discussed supra, even if defendant had shown that he received the Notice of Intent after the time period to challenge it, his failure to request an extension of time in which to respond to the Notice, or to ultimately appeal the final removal order to the Court of Appeals, negates such an argument.

With respect to the contention that defendant was deprived of fundamental fairness because the Form I-851 did not advise him that he could challenge the legal determination that his conviction for aiding and abetting second degree assault constituted an aggravated felony, or the specific basis for determining his conviction amounted to an aggravated felony, the Court finds otherwise. The Form informed defendant, under the title "Charge," the following: "You are deportable under section 237(a)(2)(A)(iii) of the Act, 8 U.S.C. 1227(a)(2)(A)(iii) as amended, because you have been convicted of an aggravated felony as defined in section 101(a)(43) of the Act, 8 U.S.C. 1101(a)(43)." Def. Ex. 1:033. Immediately above that paragraph, defendant was told that that ICE had determined that he had been convicted of the "offense of Aiding and Abetting 2d Degree Assault in violation of Minnesota State Statute 609.22 for a term of imprisonment of 36 months." Id. A few paragraphs later, beneath the title "Your Rights and Responsibilities," defendant was told he may "rebut the charges stated above (with supporting evidence)" and "request an opportunity to review the government's evidence." Id. The Form I-851 informed defendant of the charge, the

basis for the charge and that he could rebut[12] the charge.  Thus, contrary to his contention, defendant was given reasonable notice of the charge as required by 8 U.S.C. § 1228(b)(4)(A) and 8 CFR § 238.1(b)(2)(i) and the opportunity to refute it factually and legally.  Nothing in the Form suggested otherwise.

As to defendant's suggestion that because he was incarcerated and indigent at the time of the administrative removal, the removal process was fundamentally unfair, it is frequently the case that a person awaiting deportation under §1228(b) is in custody. In addition, defendant was informed that he could be represented by counsel and was given a list of attorneys who provide free legal services.  See Def. Ex. 1:033, 36.

For all of these reasons, the Court finds that defendant's rights to fundamental fairness and due process were not violated.  In addition, the Court concludes that he did not experience prejudice as a result of any alleged defects.  To demonstrate that he suffered actual prejudice, defendant must show that "there was a reasonable likelihood that but for the errors complained of the defendant would not have been deported." United States v. Benitez-Villafuerte, 186 F.3d 651, 658-59 (5th Cir. 1999).  The Court finds that because he was presumptively deportable due to his conviction for an aggravated felony, he cannot establish actual prejudice.  See United States v. Santiago-Ochoa, 447 F.3d 1015, 1020 (7th Cir. 2006) (defendant was an aggravated felon, which meant he was conclusively presumed to be subject to removal and unable to show prejudice); United States v. Garcia-Martinez, 228 F.3d 956, 963 (9th Cir. 2000) (deportation was a foregone conclusion because defendant was convicted of an

---

[12]     Merriam-Webster Online Dictionary defines "rebut" as: "to drive or beat back : repel; to contradict or oppose by formal legal argument, plea, or countervailing proof; to expose the falsity of : refute; to make or furnish an answer or counter proof."  See http://www.m-w.com/dictionary/rebut.

aggravated felony);  United States v. Martinez-Gonzalez, 203 F.3d 828 at *1 (5th Cir. 1999) (where defendant was conclusively presumed to be deportable, his deportation was a foregone conclusion and he could not establish actual prejudice).   Here, defendant would have been deported regardless of whether he had been eligible to seek voluntary departure or was subjected to expedited removal.   Having failed to establish the three prongs required to collaterally attack the deportation order, the Court therefore recommends that defendant's Motion to Dismiss be denied.

### 2.   Motion for Determination of Prior Conviction

Defendant also moved the Court to determine whether his underlying conviction constituted an aggravated felony, arguing that such a determination is relevant to not only sentencing but to this Court's determination of his Motion to Dismiss.  Def. Mot. for Court Det. of Prior Conv., ¶ 7. [Docket No. 19].   The Indictment in this case charges defendant with having been previously convicted of aiding and abetting second degree assault in violation of Minn. Stat. § 609.222, subd. 1.   This crime is considered an aggravated felony pursuant to 8 U.S.C. § 1101(a)(43)(F) because the Government alleges that it is a "crime of violence" as defined by 18 U.S.C. § 16.  Id., ¶ 2.  Section 16 requires that an offense have as an element the use, attempted use, or threatened use of force, or that it be a felony and involve a substantial risk that physical force be used, and that the use of force must be intentional.   Defendant contends that Minn. Stat. § 609.222, subd. 1, does not have as an element the intentional use of force or necessarily involve a substantial risk of the use of physical force, and therefore asks the Court to determine that defendant's prior conviction is not "a crime of violence" or an aggravated felony.  Def. Mot. for Court Det. of Prior Conv., p. 2.

In response, the Government objected to the motion on the grounds that it was not a proper pretrial motion because defendant could not collaterally attack the removal order at this juncture, and that instead it is a determination that should be made by the trial court at the time of sentencing.  Gov't Response in Opp. to Def. Mot. for Court Det. of Prior Conv., p. 1 [Docket No. 24].

Having concluded in connection with defendant's Motion to Dismiss that defendant cannot collaterally attack his removal, this Court agrees with the Government that the determination of whether the  underlying conviction constituted an aggravated felony under federal law is an issue best left for sentencing.  However, in an abundance of caution, as this Court cannot predict the final outcome of defendant's Motion to Dismiss, the Court will  review that determination at this time.  See United States v. Modica-Linos, 399 F.Supp.2d 1114 (E.D.Wash. 2005) (addressing defendant's challenge to the determination that his conviction was for an aggravated felony during motion to dismiss indictment for illegal reentry).

8 U.S.C.A. § 1101(a)(43)(F) states that the term "aggravated felony" means a crime of violence, as defined in section 16 of Title 18, for which the term of imprisonment is at least one year.  In turn, 18 U.S.C. § 16 defines a crime of violence as "(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

Minn. Stat. § 609.222, subd. 1, states that "[w]hoever assaults another with a dangerous weapon may be sentenced to imprisonment for not more than seven years

or to payment of a fine of not more than $14,000, or both."  Assault is defined as "(1) an act done with intent to cause fear in another of immediate bodily harm or death; or (2) the intentional infliction of or attempt to inflict bodily harm upon another."  Minn. Stat. § 609.02, subd. 10.

Defendant argues that the use of force under 18 U.S.C. § 16 must be intentional. The language of § 16 "requires us to look to the elements and nature of the offense of conviction, rather than to the particular facts relating to petitioner's crime."  United States v. Torres-Villalobos, 487 F.3d 607, 614 (8th Cir. 2007) (quoting Leocal v. Ashcroft, 543 U.S. 1, 7 (2004)).  "Offenses that have no mens rea component or require only a showing of negligence are not crimes of violence under § 16."  Id. at 615 (citation omitted).  "For an offense to be a crime of violence under § 16(a), the "active employment" of physical force must be an element of the offense."  Id. (citation omitted). "As with § 16(a), the 'use' of force described in § 16(b) requires a risk of 'active employment' of force, and not merely 'accidental or negligent conduct.'  Thus, § 16(b) requires a categorical determination of whether the perpetrator of the offense consciously risks that force will be 'actively employed' in the course of committing the offense."  Id. (citation omitted).

The Court finds that second degree assault as detailed in Minn. Stat. § 609.222, subd. 1, constitutes a crime of violence under § 16(b).  Assault, as it is defined in § 609.02, subd. 10, is not a crime of accident or negligence.  Intent is required – either intent to put someone in fear of harm or intent to cause bodily harm.  The statute does not provide for negligence or recklessness.  Even in the non-physical context of intent to cause fear of bodily harm, whatever action is undertaken to instill that fear carries with it

a risk that bodily harm actually will occur.  Taking into account the dangerous weapon component under § 609.222, subd. 1, threatening a person with a gun carries with it the risk that the gun could go off.  Displaying a knife to scare someone carries with it the risk that someone could be cut.  The fact that the statute involves a dangerous weapon indicates that the possessor of the dangerous weapon consciously risks that force will be actively employed in the course of committing the assault.  Minn. Stat. § 609.222, subd. 1, therefore contains the required risk of ''active employment'' of force, and the perpetrator takes the risk that the force will be 'actively employed' in the course of committing the offense.  Torres-Villalobos, 487 F.3d at 614.

Based on the foregoing analysis, the Court determines that defendant's prior conviction under Minn. Stat. § 609.222, subd. 1, constitutes an aggravated felony within the meaning of 8 U.S.C. § 1101(a)(43)(F).

## II.    MOTION TO SUPPRESS

### A.    Factual Background

On September 18, 2007, at approximately 7:45 a.m., eight to ten Immigrations and Customs Enforcement ("ICE") agents and one Ramsey County Sheriff's Deputy attempted to execute an arrest warrant for an individual named Miguel Barrera, who they believed resided at XXXX Buchanan Street N.E. in Columbia Heights, Minnesota. Barrera was a known member of a violent street gang called "Sureno 13."  Special Agent Jason Richards testified that he and two other agents went to the side door of the house while another agent knocked on the front door.  An individual inside the house, named Emerjido Duena Carmona, answered the side door.  The agents told him that they were there for Barrera and asked Carmona if Barrera lived at the house.  Carmona

stated yes, but that Barrera was not there at the time.  The agents asked if they could come in and look for him, and Carmona said yes.  When asked if he lived in the house, Carmona said yes.

Once inside, approximately four agents and Carmona sat at the kitchen table. The other agents were posted outside near the entrances to the house and near the garage.  All of the agents were wearing raid gear and were armed.  All of the agents had handguns, and a couple of the agents had longarms.

The agents gave Carmona a consent-to-search form, and Special Agent Ricardo Rocha, who spoke Spanish fluently, went over the form with him.  The form was written in Spanish.  Carmona was never handcuffed.  The form was signed by Carmona, Special Agent Richards and Special Agent Rocha.  See Gov't Ex. 1.  Special Agent Rocha testified that the house had multiple tenants, but that he did not know if they rented or the circumstances of their tenancies.

When Special Agent Benadum entered the kitchen, he saw a few agents sitting with defendant, a juvenile male, and an older male.  Eventually, an older woman came into the kitchen from upstairs and joined them.  None of the individuals were restrained. Special Agent Benadum learned that the individuals had been found throughout the house.  These four individuals were the only people present in the house when the agents arrived.  Special Agent Benadum first spoke with the juvenile.  The juvenile told Special Agent Benadum that he was from Mexico.[13]  When Special Agent Benadum

---

[13]      In several places, the Government's Post-Hearing Memorandum in Opposition to Defendant's Motion to Suppress makes reference to two statements: that the juvenile informed agents that he was in the country illegally when he was questioned in the kitchen, and that defendant informed agents that he was from Mexico and in the country illegally when he was questioned in the van.  See Gov't Mem., pp. 3, 5, 12.  The Court

asked what the juvenile what the tattoo on his hand represented, the juvenile told him it stood for "Sureno 13." Then Special Agent Benadum spoke to defendant. Special Agent Benadum asked defendant his name. Defendant gave him a name which was later determined to be fake. Defendant stated that he did not live at the Buchanan Street residence. Special Agent Benadum asked defendant for identification. Defendant said his wallet was at home, but he could not remember where his house was. Defendant also told Special Agent Benadum that his passport and visa were at his house. The woman then came into the kitchen and asked the agents what was happening. She informed the agents that her husband and Barrera had already left the house that morning. The woman asked how long the agents would be at the house because children would be arriving shortly for her to babysit. The agents left with defendant and the juvenile immediately after she informed them of her situation.

Special Agent Benadum testified the agents called for a records check on the names they had been given. When they did not receive any information on defendant and the juvenile, he instructed another agent to put them under arrest and take them in for questioning.[14]

The defendant and juvenile were placed in a transportation van parked outside the house and handcuffed. Special Agent Patrick Edgar spoke to defendant at the van; he was standing at the open door of the van and defendant and juvenile were inside the van. He advised both defendant and the juvenile of their <u>Miranda</u> rights in English.

---

has listened to the tape of the motions hearing and finds that neither of these facts were introduced through testimony at that hearing, nor through any of the exhibits submitted to the Court. Therefore, the Court has not included those facts in its analysis, and does not rely on them in this Report and Recommendation.

[14] The woman told agents she was a U.S. citizen, and Carmona produced a valid green card. Consequently, they were not arrested.

When the juvenile appeared to not understand, he read the Miranda rights again in Spanish. Special Agent Edgar read the rights directly from a pocket card. See Gov't Ex. 6. After receiving the rights, both defendant and the juvenile agreed to speak to him. Special Agent Edgar spoke with defendant mostly in English, which he understood. He asked defendant if he was lawfully in the United States and some other biographical questions.[15] At no time did Special Agent Edgar threaten defendant or make promises to defendant. Defendant never requested an attorney or ask that questioning cease.

Defendant was then transported to ICE offices in Bloomington, Minnesota. Special Agent Edgar brought him into an interview room and fingerprinted him. Defendant had originally given his name as Jose Garcia-Leal, which he later admitted was not his true name. The fingerprints showed defendant's true identity and defendant's previous contacts with immigration officers, including his "A File."[16]

Special Agent Hunter is a processing supervisor with ICE in Bloomington, and he assisted with the interview and processing of defendant. Special Agent Hunter read defendant his Miranda rights first in English, and then in Spanish. Special Agent Rocha was also present during the interview of defendant at the Bloomington ICE offices.

---

[15]     In the Government's post-hearing memorandum, it represented that while defendant was in the van, he stated to Special Agent Edgar that he was from Mexico and admitted to being in the United States illegally. Gov't Mem., pp. 3, 12. At the motions hearing, counsel for the Government did ask Special Agent Edgar if he had asked defendant whether he was lawfully in the United States and some administrative and biographical questions. Special Edgar responded "yes" to the question, but never stated what defendant's answers were to his questions.

[16]     Aliens are assigned an alien number, known as an "A number," and have an "A File," which contains a record of all contacts with immigration. Defendant's "A file" was submitted at the motions hearing. See Gov't Ex. 4.

Special Agent Rocha also read defendant his <u>Miranda</u> rights in Spanish, and defendant was given a form in Spanish that detailed his <u>Miranda</u> rights.  <u>See</u> Gov't Ex. 5.  That form was signed by defendant, Special Agent Rocha and Special Agent Hunter.  The interview was conducted in English.  Defendant understood Special Agent Rocha's questions and responded appropriately.  The interview took place in a small interview room at the ICE offices.  The interviewing agents were unarmed, and defendant was not handcuffed during his interview.  The agents did not threaten defendant or make him any promises.  Defendant never asked for an attorney or to stop questioning, and did not appear to be under the influence.  The tenor of the interview was conversational and not confrontational and defendant answered the agents' questions.  Defendant signed a sworn statement, which was submitted at the hearing.  <u>See</u> Gov't Ex. 2.

Defendant also testified at the motions hearing.  He stated that he was renting a bedroom on the first floor at the back of the house on Buchanan Street on September 18, 2007, and there was a door to his bedroom that he could lock with a key.  Defendant stated that he had been living at the house for four months and was paying rent to Barrera's brother.  He knew Carmona as another renter of a bedroom in the house.  They shared common areas of the house.

On September 18, 2007, defendant was sleeping when agents knocked on his bedroom door, which was locked.  He got out of bed and opened the door.  The agent standing at the door told defendant that he had to come to the kitchen and talk with the agents.  Defendant told the agent that he had to get dressed.  One agent went into defendant's bedroom and searched his room, and another remained outside the door.

Defendant got dressed and then he was guided to the kitchen by one of the agents who touched him on the shoulder, but not with force.

When he spoke to the agents at his bedroom, defendant testified that he was not told that he was free to leave.  Nor was he told that he was not under arrest.  He was told that if he cooperated and told agents where Barrera could be found, he could go. Defendant told the agents that Barrera was at work.  Defendant's impression was that he had to answer the agents' questions.  On cross-examination, defendant admitted that he originally told agents that he lived elsewhere.  Defendant also testified that nothing in the house indicated that it was split into apartments, there were no numbers on the bedroom doors, and there was only one mailbox.  Defendant never asked the agents to leave, but he testified that he felt he could not do so.

Defendant now seeks to suppress all testimonial and physical evidence, including all fingerprint evidence, obtained by the United States, as the result of the seizure and arrest of defendant on September 18, 2007.

    1.   Consent

Defendant first alleges that the party consenting to the ICE agents' entry (Carmona) into the Buchanan Street home did not have access to or the right to enter defendant's bedroom.  The Government argues that Carmona had apparent authority to give consent.

A warrantless search does not violate the Fourth Amendment when law enforcement officers obtain voluntary consent from the individual whose property is searched or from a third party with common authority over the property.  Illinois v. Rodriguez, 497 U.S. 177, 181 (1990).  "For a third-party consent to a warrantless police

search to be legally effective, the consenting party must have actual or apparent authority to give the consent." United States v. Miller, 152 F.3d 813, 815 (8th Cir. 1998) (citing United States v. Matlock, 415 U.S. 164, 171 n. 7 (1974) (actual authority); Rodriguez, 497 U.S. at 188-89, (apparent authority)).   The Government bears the burden of demonstrating that valid consent existed.  See United States v. James 353 F.3d 606, 613 (8th Cir. 2003) (citation omitted).

In order for there to be actual authority to give consent by a third party, the individual must possesses common authority over a premises or a sufficient relationship to the premises sought to be inspected.  See  Matlock, 415 U.S. at 171; see also United States v. Eldridge, 984 F.2d 943, 948 (8th Cir. 1993) (finding that consent may be given by a third-party who possesses common authority over or other relationship to the premises).  Common authority "is not to be implied from the mere property interest of the third party but "rests on the mutual use of the property by persons having joint access or control . . . ."  Id. at 172, n. 7; see also James, 353 F.3d at 613 ("Common authority is a function of mutual use, joint access, and control . . . and is a question of fact.") (citations omitted).  Furthermore,

> [e]ven if the third party lacked the requisite common authority, the Fourth Amendment is not violated if the police reasonably believed the consent was valid. See Illinois v. Rodriguez, 497 U.S. 177, 188-89, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). In such a case, the critical inquiry is whether the facts available to the police at the time the consent is given would warrant a person of reasonable caution to believe the consenting party had authority over the place to be searched. See United States v. Elam, 441 F.3d 601, 603 (8th Cir. 2006).

United States v. Hilliard, 490 F.3d 635, 639 (8th Cir. 2007).

With regard to apparent authority, "[t]he relevant inquiry is whether the facts available would have justified a reasonable officer in the belief that the consenting party

had authority over the premises." <u>United States v. Czeck</u>, 105 F.3d 1235, 1239 (8th Cir.1997) (citing <u>Rodriguez</u>, 497 U.S. at 188); <u>see</u> <u>also</u> <u>James</u> 353 F.3d at 615 (providing that the inquiry into apparent authority is whether "the facts available to the officer at the time the consent is given warrant a person of reasonable caution in the belief that the consenting party had authority over the item to be searched") (citations omitted).

The Court finds that it was reasonable for the ICE agents to believe that Carmona had authority to consent to the search of the house.  Carmona told the agents that he lived in the house.  He signed a Consent to Search form that was written in Spanish.  <u>See</u> Gov't Ex. 1.  That form authorized the agents to conduct a complete search of the premises.  The house was not split into residences, there were no numbers on the bedroom doors, and there was only one mailbox.  The agents had no reason to believe that Carmona did not have authority over the premises.  Additionally, defendant was present during the search of the premises and did not object, and importantly, told the agents that he lived somewhere else.  Therefore, defendant gave the agents no grounds to believe that he had a privacy interest in the place to be searched.  <u>See</u> <u>Hilliard</u>, 490 F.3d 639 (defendant's silence in the face of events taking place in his own residence gave the officers no reason to believe he had a privacy interest or to doubt third party's authority over the residence); <u>Elam</u>, 441 F.3d at 603-04 (defendant's presence and failure to object during a search gave the officers no reason to believe the defendant had a superior privacy interest in the place to be searched).  Therefore, because the agents reasonably believed that Carmona had the authority to consent to a search of the residence, the warrantless search of the Buchanan Street

residence, including the bedroom where they found defendant, did not violate the Fourth Amendment.

### 2.   Initial Questioning in the Kitchen

Defendant next contends that the questioning of him in the kitchen of the house was illegal because he was subjected to custodial interrogation and was not given his Miranda rights prior to the questioning.

### a.   Custody

Miranda v. Arizona requires that an individual be advised of her right to be free from compulsory self-incrimination and the right to the assistance of an attorney anytime the individual is taken into custody for questioning.  Miranda v. Arizona, 384 U.S. 436, 444 (1966); see also United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990). Therefore, the protections afforded by Miranda are triggered when an individual "is both in custody and being interrogated."  United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995) (citing United States v. Lawrence, 952 F.2d 1034, 1036 (8th Cir.), cert. denied, 503 U.S. 1011 (1992)).  "Custody occurs either upon formal arrest or under any other circumstances where the suspect is deprived of his freedom of action in any significant way."  Miranda, 384 U.S. at 444.

 When determining whether a suspect is in custody, courts consider the following six "indicia of custody":

> (1)     whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not under arrest;

> (2)     whether the suspect possessed unrestrained freedom of movement during the questioning;

(3)     whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;

(4)     whether strong arm tactics or deceptive stratagems were employed during questioning;

(5)     whether the atmosphere of the questioning was police dominated; and

(6)     whether the suspect was placed under arrest at the termination of the questioning.

Griffin, 922 F.2d at 1349; see also, e.g., United States v. Axsom, 289 F.3d 496 (8th Cir. 2002).  The first three factors are considered "mitigating factors" which, if found, tend to show that the suspect was not in custody.  Griffin, 922 F.2d at 1349.  The remaining three factors are characterized as "coercive factors" which, if found, tend to show the existence of custody.  Id.

The determination of whether an individual is in custody at a particular time depends on "the extent of the physical or psychological restraints placed on the suspect during interrogation in light of whether a 'reasonable person in the suspect's position would have understood his situation' to be one of custody."  Griffin, 922 F.2d at 1347 (quoting Berkemer v. McCarty, 468 U.S. 420, 442 (1984)).  Moreover, the determination is based on the totality of the circumstances, with none of the factors being dispositive, and a particularly strong showing on one factor may compensate for a deficiency on another factor.  Griffin, 922 F.2d at 1347.  The ultimate inquiry is whether there was a formal arrest or restraint on defendant's movement of the degree associated with a formal arrest.  Stansbury v. California, 511 U.S. 318, 322 (1995).

With regard to the first factor, there is no evidence in the record that defendant was informed that the questioning was voluntary, that he was free to leave or request

the officers to do so, or that he was not under arrest.   As such, this factor weighs in favor of a finding that defendant was in custody. [17]

The second factor addresses whether defendant possessed unrestrained freedom of movement during the questioning.   On the one hand, defendant was not handcuffed during the questioning in the kitchen.   On the other hand, he was escorted into the kitchen by agents and there were approximately four agents in the kitchen and at the doors leading out of the kitchen.   "We realize that the likely effect on a suspect of being placed under guard during questioning, or told to remain in the sight of interrogating officials, is to associate these restraints with a formal arrest."   Griffin, 922 F.2d at 1350.   This factor weighs in favor of a finding that defendant was in custody.

Regarding the third factor, defendant did not initiate contact with authorities, and he testified that he believed he had to answer the agents' questions.   This factor weighs in favor of a finding that defendant was in custody.

The fourth factor focuses on whether strong arm tactics or deceptive stratagems were employed during questioning.   Defendant testified that agents told him that if he cooperated, he would be released.   Defendant told them Barerra was at work.   While the Court was unable to find case law that addresses whether promises of leniency constitute strong arm tactics or deceptive stratagems, in the context of confessions courts have held that promises of lenient treatment may render a confession involuntary.   See e.g. United States v. Wrice, 954 F.2d 406, 411 (6th Cir. 1992) ("[W]e concede, for the sake of argument, that a promise of lenient treatment or of immediate

---

[17]   When the woman who resided at the house asked the agents how long they would be at the house because she had children arriving soon, they left immediately. However, this occurred after defendant had already been questioned by Special Agent Benadum in the kitchen.

release may be so attractive as to render a confession involuntary."); United States v. Rogers, 906 F.2d 189, 192 (5th Cir. 1990) (confession deemed involuntary because defendant acted in reliance on officers' promise that he would not be arrested if he cooperated).  The fact is, defendant was not released after he spoke with the agents and told them where Barerra could be found, suggesting that their statements were deceptive.  Therefore, the Court finds that deceptive tactics were employed during the questioning in the kitchen.

The fifth factor addresses whether the atmosphere of the questioning was police dominated.  The factors that must be analyzed in evaluating the factor of police domination include the place and length of the interrogation, whether the police controlled the interrogation site and dictated the course of conduct of the suspect and other individuals, and whether the suspect was removed "from the presence of family, friends, or colleagues who might lend moral support during the questioning."  Griffin, 922 F.2d at 1352.  Here, the interview took place at defendant's own residence, suggesting that it was non-custodial.  "When a person is questioned 'on his own turf,' we have observed repeatedly that the surroundings are 'not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation.'"  United States v. Czichray, 378 F.3d 822, 826 (8th Cir. 2004) (quoting United States v. Rorex, 737 F.2d 753, 756 (8th Cir.1984); United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir.1985)).  See also Axsom, 289 F.3d at 502 ("When a suspect is interrogated in the comfort and familiarity of his home, a court is less likely to find the circumstances custodial.").  On the other hand, there were far more law enforcement officers than non-law enforcement persons present at the house – approximately eight to ten agents and

the four residents — although in the kitchen, where the questioning occurred, there were an equal number of law enforcement and non-law enforcement persons present. Given the sheer number of armed law enforcement agents at the house, the fact that the officers were posted at the entrances to and surrounding the home, and that all of the occupants were brought to the kitchen for questioning at the same time, leads the Court to find that the police controlled the interrogation site and dictated the course of conduct of defendant and the other individuals. This finding weighs in favor of finding that defendant was in custody.

Finally, defendant was placed under arrest at the termination of the questioning. This factor also weighs in favor of a finding of custody.

Based on the totality of the circumstances, the Court concludes that a reasonable person in defendant's position would have believed that he was in custody. Defendant was awakened at approximately 7:45 a.m. by two officers at his bedroom door. His room was searched by one of the officers and he was directed to go to the kitchen for questioning. One of the officers accompanied him to the kitchen. In the kitchen, there were three or four officers present who were wearing raid gear and were armed, and several others were stationed in and around the house. Defendant was never told that that he did not have to answer questions, that he was free to leave or that he would not be placed under arrest. Instead, he was only told that he could leave if he cooperated, and when he told them where Barerra could be found, he was not released as promised. There is nothing about these facts that would lead a reasonable person to believe that he was free to go at any time during this encounter. The Court finds that

defendant was in custody when he was questioned by Special Agent Benadum in the kitchen.

b.   Interrogation

An individual must also be subjected to interrogation to trigger the protections afforded by Miranda.   Hatten, 68 F.3d at 261.   "Interrogation" means "questioning initiated by law enforcement officers."   Miranda, 384 U.S. at 444.   The term "interrogation" is defined as "'express questioning or its functional equivalent.'   This includes 'any words or actions on the part of the police (*other than those normally attendant to arrest and custody*) that the police should know are reasonably likely to elicit an incriminating response . . .'"   United States v. Henderson, 770 F.2d 724, 728 (8th Cir. 1985) (emphasis in original) (quoting Rhode Island v. Innis, 446 U.S. 291, 300-301 (1980); United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995)).   Thus, the test for determining whether questioning is an "interrogation" within the meaning of Miranda, is whether, under all of the circumstances involved in a given case, questions are reasonably likely to elicit an incriminating response from the suspect.   See Innis, 446 U.S. at 300-01.

During the questioning in the kitchen, when Special Agent Benadum asked defendant's name, defendant gave his name as Jose Garcia-Leal.   When Special Agent Benadum asked him for identification, he said his wallet was at home but that he did not remember where his house was.   He also told Special Agent Benadum that his passport and visa were at his house.

"[A] request for routine information necessary for basic identification purposes is not interrogation under Miranda, even if the information turns out to be incriminating.

Only if the Government agent should reasonably be aware that the information sought, while merely for basic identification purposes in the usual case, is directly relevant to the substantive offense charged, will the questioning be subject to scrutiny." United States v. McLaughlin, 777 F.2d 388, 391-92 (8th Cir. 1985) (citing United States v. Burns, 684 F.2d 1066, 1075-76 (2d Cir.1982)). See also United States v. Gallardo, 58 F.Supp.2d 1018, 1022 (S.D.Iowa 1999) (finding that questions asking defendant's name, residence and date of birth fell within identification questions exception, but also finding that questions asking defendant about his citizenship and his alien status in the United States were beyond the limited scope of the exception); United States v. Henley, 984 F.2d 1040, 1042 (9th Cir. 1993) ("[E]ven routine questioning may amount to interrogation. Thus, while there is usually nothing objectionable about asking a detainee his place of birth, the same question assumes a completely different character when an INS agent asks it of a person he suspects is an illegal alien.").

Here, the information sought by Special Agent Benadum was directly relevant to the substantive offense charged.  In addition, while the information could be considered biographical in a situation not involving immigration, the whole reason that Special Agent Benadum and the other ICE agents were at the Buchanan Street residence was to effectuate the arrest of an illegal alien, Barrera, who was suspected of being a member of a violent street gang called "Sureno 13."  The juvenile residing at the home, who was interviewed at the same time as defendant, stated that the tattoo on his hand stood for Sureno 13.  Therefore, Special Agent Benadum, an ICE agent, should have known that his questioning could elicit incriminating responses to his questions from defendant.

The Court finds that Special Agent Benadum's questioning of defendant does not fall within the identification question exception to <u>Miranda</u>, and that defendant was subject to interrogation when he was questioned in the kitchen.

The Government urges the Court to find that while defendant was briefly detained in the kitchen of his home as officers conducted the search of the house for Barerra, he was not in custody because officers have limited authority to detain occupants of a premise while a search is being conducted.  The Government cites to <u>Michigan v. Summers</u> for this proposition, in which the Supreme Court stated that "for Fourth Amendment purposes, we hold that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted."  452 U.S. 692, 705 (1981).  The Government contends that the holding in <u>Summers</u> was extended to consensual searches by the Eighth Circuit in <u>United States v. Hernandez-Hernandez</u>, 327 F.3d 703, 706 (8th Cir. 2003), and argues that <u>Hernandez-Hernandez</u> disposes of any suggestion that defendant was being interrogated.  <u>Hernandez-Hernandez</u> is inapposite.

In <u>Hernandez-Hernandez</u>, a team of officers, including an ICE agent, went to Hernandez-Hernandez's house to investigate information they had received that Hernandez-Hernandez, a Hispanic male, was distributing drugs from and had firearms at his home.  Hernandez-Hernandez and others were detained outside the house during a consensual search of the house.  During that detention, the ICE agent asked Hernandez-Hernandez questions to determine his identity, including of what country he was a citizen, whether he had any papers to be legally in the United States, and whether he was legally or illegally in the country.  <u>Id</u>. at 705.  At that time, Hernandez-

Hernandez told the agent that he was in the United States illegally.  Id.  The agent then arrested Hernandez-Hernandez for violating the immigration laws and handcuffed him. Id.  Hernandez-Hernandez moved to suppress his statements to the ICE agent because he had not been given his Miranda warnings prior to being questioned.  The Eighth Circuit determined that at the time Hernandez-Hernandez was questioned by the ICE agent, Hernandez-Hernandez was not handcuffed and had not been arrested, and thus, the facts did not show that he was restrained to the degree associated with a formal arrest.  Id. at 706.  The court then found that because Hernandez-Hernandez was being detained as part of a Terry stop, it was permissible to ask a moderate number of questions determine his identity.  Id. at 706 (citations omitted).

Hernandez-Hernandez is distinguishable from the instant case.  Hernandez-Hernandez was detained because officers had reasonable suspicion that he was engaged in criminal activity and that he was armed and dangerous.  Id. at 706-07. Here, agents had no reason to believe that defendant had engaged in any criminal activity at the time they detained him in the kitchen.  It was only after he answered the agents' questions regarding his identification and where he lived, that the agents suspected defendant of any wrongdoing.

Finally, even if this Court were to find, pursuant to Summers, that defendant was permissibly detained for Fourth Amendment purposes because a consensual search was being conducted, custody for purposes of the Fourth Amendment and custody for purposes of Miranda are not equivalent.  The Government does not provide, and the Court cannot find, any authority for the proposition that it is permissible to question an individual legally detained while a proper search is being conducted without the

protections of <u>Miranda</u>.  <u>Summers</u> does not address custodial interrogation.  Although an individual may be legally detained within the Fourth Amendment during a proper search pursuant to <u>Summers</u>, his movement is still restrained and he is still physically in custody.  To permit law enforcement to then question individuals while they are being detained during the execution of a search would completely eviscerate the purpose of <u>Miranda</u>.  "[W]hether an individual detained during the execution of a search warrant has been unreasonably seized for Fourth Amendment purposes and whether that individual is "in custody" for <u>Miranda</u> purposes are two different issues."  <u>United States v. Kim</u>, 292 F.3d 969, 976 (9th Cir. 2002).  <u>See</u> <u>also</u> <u>United States v. Newton</u>, 369 F.3d 659, 673 (2d Cir. 2004) ("This court, however, has specifically rejected Fourth Amendment reasonableness as the standard for resolving <u>Miranda</u> custody challenges…'whether [a] 'stop' was permissible under <u>Terry v. Ohio</u> ... is irrelevant to the <u>Miranda</u> analysis. <u>Terry</u> is an 'exception' to the Fourth Amendment probable cause requirement, not to the Fifth Amendment protections against self-incrimination.'") (citation omitted); <u>United States v. Smith</u>, 3 F.3d 1088, 1097 (7th Cir. 1993) ("the inquiry into the circumstances of temporary detention for a Fifth and Sixth Amendment <u>Miranda</u> analysis require a different focus than that for a Fourth Amendment <u>Terry</u> stop…").  As such, the Court rejects the Government's contention that defendant was not subjected to a custodial interrogation at the time he was questioned in the kitchen.

In summary, this Court concludes that a person in defendant's position would not have felt free to leave the house during the questioning by the agents in the kitchen. There were between eight and ten ICE agents in and outside of the house.  Defendant was brought to the kitchen with the rest of the occupants of the house for questioning.

After answering the agents' questions, he was arrested.  Based on the totality of these circumstances, the Court finds that defendant was in custody and subjected to interrogation without the protections of <u>Miranda</u>.  Consequently, the Court recommends that defendant's motion to suppress the statements he made in the kitchen be granted.

3.    <u>Defendant's Arrest</u>

In support of his motion to suppress the subsequent statements and fingerprints he gave to ICE agents, defendant argues that because his arrest was not supported by probable cause, these later statements and fingerprints must all be suppressed as the fruit of the poisonous tree.  The Government disagrees, contending that he was validly interrogated and arrested pursuant to 8 U.S.C. § 1357(a), which states:

> Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—
>
> (1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;
>
> (2) to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States…

The present case is analogous to <u>United States v. Flores-Sandoval</u>, 422 F.3d 711 (8th Cir. 2005).  There, without first being apprised of his <u>Miranda</u> rights, Flores-Sandoval was questioned by an agent from the United States Border Patrol, at which time he admitted to being in the country illegally.  <u>Id.</u> at 713.  He was then taken to jail where he was placed on civil administrative detainer.  <u>Id.</u>  The Border Patrol called an

ICE agent and informed him that Flores-Sandoval was being detained for being a possible illegal alien.  Id.  The next day, Flores-Sandoval was transported to the ICE office where he was fingerprinted.  Id.  The automated fingerprint identification system searched ICE records to determine if Flores-Sandoval had ever been arrested, deported or had attempted to enter the country illegally.  Id.  The results from the search indicated that Flores-Sandoval had previously been deported as an alien.  Id.  Flores-Sandoval was then questioned after being read and waiving his Miranda rights, at which time he admitted that he had been previously deported.  Id.  Flores-Sandoval was subsequently indicted under 8 U.S.C. § 1326(a) for re-entry after deportation.  Id.  He moved to suppress the initial statement he gave to the Border Patrol and his later statement to the ICE agent, along with his fingerprints, on grounds that his detention was illegal and the evidence obtained was the "fruit of the poisonous tree."[18]  Id.  The court granted the motion.  Id.  On appeal, the Government asserted that ICE's detention of Flores-Sandoval was lawful because he had admitted to being an illegal alien to the Border Patrol, which gave ICE a proper basis to detain him pursuant to 8 U.S.C. § 1357(a).  Id. at 714.  The Eighth Circuit rejected the government's contention, finding that Flores-Sandoval's initial detention and arrest was unlawful and affirmed the suppression of Flores-Sandoval's statements to the Border Patrol agent and ICE agent and his fingerprints.[19]  Id. at 715.  First, it found there was no record that Flores-Sandoval had

---

[18]    Flores-Sandoval also moved to suppress his fingerprints, which the district court granted, and the Eighth Circuit affirmed. See discussion on fingerprints, infra.

[19]    The Court notes that the Eighth Circuit analyzed both the legality of Flores-Sandoval's statement to the Border Patrol and his fingerprints. However, in affirming the district court's decision to suppress all statements and the fingerprints, the appellate court did not discuss its reasoning for affirming the suppression of Flores-Sandoval's

received a <u>Miranda</u> warning from Border Patrol prior to being questioned and making his inculpatory statement.  Thus, it suppressed the statement and found that it could not be used to support ICE's placing Flores-Sandoval into custody and to obtaining additional statements or fingerprints from him.  <u>Id.</u> Second, because the Government had not shown that ICE had formed a reason to believe that Flores-Sandoval was an illegal alien based on anything other than his suppressed statement to the Border Patrol, it determined that there was no evidence to justify detaining him pursuant to 8 U.S.C. § 1357(a).  <u>Id</u>.

The same is true here.  The Government argues that the agents had reason to detain defendant for three reasons: (1) defendant resided in a home with at least one illegal alien – the fugitive, Barrera;[20] (2) defendant gave an incredible response to Special Agent Benadum's request for identification – that he had left his passport and visa at home, but he could not remember where his house was located; and (3) he spoke with a thick accent.  Gov't Post-hearing Suppression Mem., pp. 10, 13.  Since this Court has determined that any statements defendant made during his detention at the house should be suppressed because they were made without the benefit of a <u>Miranda</u> warning, the only information the agents possessed to arrest defendant was that he resided in a house with one illegal alien and that he had a "thick accent."  But this information was tenuous at best, given that defendant told the agents he did not reside in the house, and that agents also knew that two other residents were <u>legally</u> in

_____

statement after the <u>Miranda </u>warning had been given to him.  <u>Flores-Sandoval</u>, 422 F. 3d at 715.
[20]     The Government also argued that defendant resided with a second illegal alien, the juvenile who had admitted that he was illegally in the United States.  However, as this Court has previously discussed, no such testimony was elicited from Special Agent Benadum or any other witness.

the United States – Carmona and the woman at the house.  "A plain reading of [§ 1357(a)(1)] requires the government to show that immigration officials <u>believed</u> [defendant] was an alien before questioning him."  <u>Flores-Sandoval</u>, 422 F.3d at 714 (emphasis in original).  The Court does not find that the presumption that defendant resided with one illegal alien, and the fact that he had an accent, were sufficient to support a belief that he was also an illegal alien.  As such, the Government has not demonstrated probable cause for his detention, and his ultimate arrest.

The Government also argued that since defendant was given <u>Miranda</u> warnings prior to his actual arrest, and that the statements that he made after receiving the warnings were the basis for his arrest, those statements and the subsequent arrest are valid.  Gov't Post-Hearing Suppression Mem., pp. 3, 12.  This argument is devoid of factual support.  The testimony by Special Agent Benadum was that the juvenile and defendant were arrested after questioning in the kitchen and before they were taken to the van for transport to the ICE office.  Thus, the arrest occurred before defendant was administered the <u>Miranda</u> warnings by Special Agent Edgar in the van.

Moreover, as discussed above, the only basis the agents had for taking defendant to the van, where he was subsequently administered the <u>Miranda</u> warning, was his illegally obtained statements inside the house.  The <u>Miranda</u> warnings defendant received in the van, and his subsequent statements cannot cure his unlawful arrest.  And as discussed below, the statements at the van were not sufficiently attenuated from the illegal arrest to be admissible.

For all of the reasons, this Court finds that there was not probable cause for defendant's arrest.

d.    Post-Arrest Statements and Fingerprints

Defendant contends that because his arrest was unlawful, the post-arrest statements and fingerprints taken from him after he was transported to the ICE offices should be suppressed.  In response, the Government contends that his statements are admissible because they are sufficiently attenuated from one another and the fingerprints should not be suppressed because they were performed pursuant to routine and ministerial tasks ICE is required to do.

i.    Statements

In general, statements that are the result of an illegal detention are not admissible.  See United States v. Hernandez-Hernandez, 384 F.3d 562, 565 (8th Cir. 2004) (citation omitted).  "The causal chain between an illegal arrest and a statement given later is broken, however, 'if the statement is 'sufficiently an act of free will to purge the primary taint.'"  Id. (quoting United States v. Ramos, 42 F.3d 1160, 1164 (8th Cir. 1994), quoting Wong Sun v. United States, 371 U.S. 471, 486 (1963)).  In order for the causal chain between the illegal arrest and a subsequent statement to be broken, the statement must not only meet Fifth Amendment standards of voluntariness, but the statement must also be "'sufficiently an act of free will to purge the primary taint'" for Fourth Amendment purposes.  See Brown v. Illinois, 422 U.S. 590, 602 (1975) (quoting Wong Sun, 371 U.S. at 486).  Whether there is sufficient attenuation between the evidence and challenged action turns on several factors, including the temporal distance between the taint and the fruit, an intervening event which dissipates or purges the taint, and the seriousness of the violation.  See e.g., Dunaway v. New York, 442 U.S. 200, 218-219 (1979); United States v. McGill, 125 F.3d 642, 644 (8th Cir. 1997)

(citations omitted) Hernandez-Hernandez, 384 F.3d at 565 ("To decide whether a confession is the product of a free will, courts consider Miranda warnings, the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and particularly, the purpose and flagrancy of the official misconduct.").

With regard to defendant's second statement, taken in the van, the Court finds that it was not sufficiently attenuated from the illegal arrest.  The second statement occurred almost immediately after the first statement, and took place right outside the house.  The statement occurred as part of a continuous process, and as such, it cannot be said that the causal chain from the illegal arrest to the statement was broken.

> In this case, there was no passage of time to speak of between the unwarned confession and the subsequent warnings and confession, all of which occurred as part and parcel of a continuous process.  Thus, the second confession came almost directly on the heels of the first.  Although Elstad precludes the formulation of a 'rigid rule' in determining the admissibility of the second confession, our review of 'the surrounding circumstances and the entire course of police conduct with respect to the suspect,' convinces us that the second confession cannot be allowed into evidence.

United States v. Carter, 884 F. 2d 368, 373 (8th Cir. 1989) (quoting Oregon v. Elstad, 470 U.S. 298, 318 (1985)).

The third statement of defendant was taken at ICE headquarters in Bloomington. While it is true that advising a defendant of his Miranda rights after an illegal arrest and before a statement was given is not "alone and per se" enough to indicate that the confession was "sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession," Brown, 422 U.S. at 603, here the Court finds that defendant's third statement was sufficiently attenuated from his illegal detention and was voluntarily given.  First, the statement

occurred three to four hours later at an entirely different location from the first two statements. Second, it occurred after defendant had been Mirandized twice at the van by Special Agent Edgar in both English and Spanish, and again at the ICE offices, several hours later, where defendant was Mirandized three more times, once by Special Agent Hunter (who read defendant the rights in both English and Spanish) and again by Special Agent Rocha, who read them in Spanish. Third, the statement was knowingly and voluntarily made.

There is no argument by defendant that he was not properly Mirandized on any of these occasions. Defendant only argues that the combination of being subjected to an unconstitutional entry and search of his personal lving space, interrogated at his home without the benefit of Miranda, arrested without probable cause, and fingerprinted, all resulted in his will being overborne and his perceiving that exercise of his right to remain silent would be fruitless. Def. Post-Hearing Suppression Mem., p. 10. Therefore, defendant argues that his statement was not voluntary.

Coercive police activity is a necessary predicate to the finding that a statement was made involuntarily. Colorado v. Connelly, 479 U.S. 157, 167, 107 S.Ct. 515, 522 (1986). "In considering whether a [statement] was voluntary, the determinative question is whether the [statement] was extracted by threats, violence, or promises (express or implied), such that the defendant's will was overborne and his or her capacity for self-determination was critically impaired." United States v. Pierce, 152 F.3d 808, 812 (8th Cir. 1998) (citing Sumpter v. Nix, 863 F.2d 563, 565 (8th Cir.1988) (citation omitted)). "In making this determination, courts look at the totality of the circumstances, including the conduct of the law enforcement officials and the defendant's capacity to resist any

pressure."  Id. (citing United States v. Meirovitz, 918 F.2d 1376, 1379 (8th Cir.1990),

cert. denied, 502 U.S. 829, 112 S.Ct. 101, 116 L.Ed.2d 71 (1991)).

The record shows that the interview at ICE headquarters was not confrontational,

but was instead conversational and defendant answered the questions asked of him.

Defendant was not threatened, and the interviewing agents made no promises to

defendant.  At no time did defendant ask for an attorney or request that the interview

stop.  Defendant understood the questions and responded appropriately.

Based on the record, the Court does not find that defendant's will was overborne

such that his statement was involuntarily given.  As such, the Court concludes that the

causal chain between defendant's illegal arrest and his third statement at ICE offices

was broken, the statement was knowingly and voluntary, and defendant's third

statement is admissible.

ii.   Fingerprints

Defendant also contends that his fingerprints should be suppressed on the basis

that they were taken after his illegal arrest for investigatory purposes because identity is

an essential element of any immigration-related offense.   Def. Post-Hearing

Suppression Mem., p. 11.  The Government responds that the agents did not exploit

defendant's arrest for the purpose of furthering their investigation, and instead asserts

that the fingerprints were taken as part of the routine, ministerial tasks they are required

by federal regulation to perform.  Gov't Post-Hearing Suppression Mem., p. 15.

Two cases recently decided by the Eighth Circuit, United States v. Guevara-

Martinez, 262 F.3d 751 (8th Cir. 2001), and Flores-Sandoval, supra, bear on the Court's

analysis of the admissibility of defendant's fingerprints.  In Guevara-Martinez, the Eighth

Circuit concluded that the officers "obtained [the defendant's] fingerprints by exploiting his unlawful detention, instead of by means sufficient to have purged the taint of the initial illegality." Id. at 755. There, Guevara-Martinez was a passenger in a car that was stopped by Omaha police. Id. at 752. The officers found methamphetamine in the car and placed Guevara-Martinez under arrest. Id. During the course of the stop, officers asked Guevara-Martinez for his name. Id. At first, he did not respond; later he told the officer he had no identification. Id. The officer removed an ID from Guevara-Martinez's wallet and learned that it did not match his appearance. Id. Suspecting that he might be an illegal alien, Guevara-Martinez was transported to jail and the Omaha police officer contacted the INS. Id. The INS agent went to the jail and interviewed Guevara-Martinez at which time he gave a false name and admitted he did not have permission to be in the United States. Id. The next day, Guevara-Martinez was fingerprinted by Omaha police. Id. Nothing in the record showed that Guevara-Martinez had consented to the fingerprinting. Id. Ultimately, the fingerprints revealed Guevara-Martinez's true identity and linked him to his INS file, which showed that he had been previously deported from the United States. Id. Guevara-Martinez was subsequently indicted for possession with intent to deliver methamphetamine. Id. This charge was later dismissed after the district court ruled the stop was illegal and suppressed the drugs seized during the stop. Id. Shortly after the government dismissed the drug charge, Guevara-Martinez was indicted for being an illegal alien found in the country after deportation, in violation of 8 U.S.C. § 1326. Id. In affirming the district court's decision to suppress Guevara-Martinez's fingerprints,[21] the court recognized "[e]vidence can be

---

[21]    The district court also suppressed the statements, but the Government did not

obtained by 'exploitation' of an unlawful detention even when the detention is not for the sole purpose of gathering that evidence." Id.  In reaching its decision, the Eighth Circuit found four circumstances to be instructive: (1) Guevara-Martinez did not consent to the fingerprinting; (2) the fingerprints were obtained during the unlawful detention, not as the result of a subsequent investigation; (3) the fingerprinting occurred only after ICE had interviewed Guevara-Martinez; and (4) the Government offered no evidence to show that the fingerprints were obtained as a matter of course through routine booking procedures, rather than for the purpose of assisting the ICE investigation.  Id. at 756. The court concluded by stating that "[t]he absence of evidence that the fingerprinting resulted from routine booking, and the concomitant inference that an INS-related purpose motivated the fingerprinting, also counsel in favor of applying the exclusionary rule." Id.

Similarly, in United States v. Flores-Sandoval, supra, the Eighth Circuit suppressed the fingerprints taken from Flores-Sandoval the day after he was arrested after determining that there was no showing that he consented to the taking of the fingerprints and it was unlikely that he felt free to decline a request for fingerprints. 422 F.3d at 715.  In addition, the court found they were taken during a custodial detention by ICE that was not constitutionally justified, and were taken for the purpose of assisting the ICE investigation.  Id.

Here, there is no evidence in the record as to whether defendant did or did not consent to the fingerprints.  Further, like Guevara-Martinez and Flores-Sandoval, the fingerprints were obtained during the unlawful detention, and only after ICE had

---

appeal that decision.  Id. at 753.

unlawfully interviewed defendant at the kitchen and the van.  Therefore, what remains for the Court's consideration is whether the fingerprints were obtained as a matter of course through routine booking procedures, or if they were obtained for the purpose of assisting the investigation.

The Government has offered evidence that defendant's fingerprints were taken pursuant to routine booking procedure.  Special Agent Benadum testified that the reason ICE engages in fingerprinting is to gain the true identity of a person, and that often people will give false identification to immigration officials.  Special Agent Benadum also stated that pursuant to 8 C.F.R. § 236.5, every person over fourteen years of age who is taken into ICE custody is fingerprinted, and that the purpose is to ensure that every person is who they say they are.  However, Special Agent Edgar, the officer who obtained defendant's fingerprints, testified that the fingerprints not only showed defendant's true identity, but also his previous contacts with immigration officers and the production of his "A File."

"[A]n alien's fingerprints taken as part of routine booking procedures but intended to provide evidence for a criminal prosecution are still motivated by an investigative, rather than an administrative, purpose. Such fingerprints are, accordingly, subject to exclusion." United States v. Oscar-Torres, 507 F.3d 224, 231 (4th Cir. 2007) (citing United States v. Olivares-Rangel, 458 F.3d 1104, 1114 (10th Cir. 2006)).

This Court finds that this case cannot be distinguished from the circumstances that lead to the suppression of the fingerprints in both Guevara-Martinez, supra, and Flores-Sandoval, supra.  In both cases, like here, the fingerprinting procedure allowed ICE to determine not only the identity of the suspect, but his previous contacts with

immigration.  See Guevara-Martinez, 262 F. 3d at 752 ("Ultimately, the fingerprints revealed Guevara-Martinez's true identity, which linked him to his INS file.  The INS file indicated that he had been previously deported from the United States."); Flores-Sandoval, 422 F. 3d at 713 (The automated fingerprint identification system "searched ICE records to determine if Flores-Sandoval had ever been arrested or deported or had attempted to enter the country illegally.  The system indicated that Flores-Sandoval previously had been deported as an alien.").

While Special Agent Benadum testified that defendant's fingerprints were taken as part of the routine booking procedure, testimony that was not elicited in Guevara-Martinez and Flores-Sandoval, it is also true that the fingerprints were not obtained solely to identify defendant.  They were also used to determine his prior contacts with ICE, which in the context of this case, where the Government maintains that they had interrogated and arrested him because they believed that he was present in the United States illegally, it is evident that the fingerprinting was being used for an investigative purpose as well.  In fact, not only did none of the agents testifying at the hearing state that defendant was arrested or fingerprinted only for an administrative civil deportation (see Oscar-Torres, 507 F.3d at 231), but as discussed above, the Government partially relied on 8 U.S.C § 1357 as a basis for the detainment and questioning of defendant. This is not a strictly administrative statute; in addition to permitting warrantless arrests for aliens suspected of immigration law violations, the powers enumerated in § 1357 also include the power to make arrests for commission of any suspected felonies.  8 U.S.C. § 1357 (a)(5)(B).  Thus, even if the motivation for fingerprinting defendant was

both investigative and administrative, the fingerprints must still be suppressed. Oscar-Torres, 507 F.3d at 232.

Accordingly, where there is no evidence that defendant consented to his fingerprints being taken, the fingerprints were obtained during the unlawful detention, and the fingerprints were taken in whole or in part for an investigative purpose, and not just to confirm his identity, the Court finds that defendant's fingerprints must be suppressed because they "were obtained 'by exploitation' of the primary illegality, instead of 'by means sufficiently distinguishable to be purged by the primary taint.'"[22] Guevara-Martinez, 262 F.3d at 755 (quoting Wong Sun, 371 U.S. at 488).

---

[22] This Court recognizes that it has found that the statement obtained from defendant at the ICE office was sufficiently attenuated from his illegal arrest, while at the same time finding that his fingerprints were not. The reason for this outcome is that there were no intervening events between defendant's illegal arrest and the taking of his fingerprints. Defendant was unlawfully detained, transported to the ICE office and then fingerprinted. However, in addition to obtaining the third statement at the ICE office several hours after his arrest, that statement was taken after he had been administered the Miranda warning five times and the Court was satisfied that the statement was voluntary. See e.g. Battle v. Delo, 19 F.3d 1547, 1564 (8th Cir. 1994) (finding a confession voluntary after defendant received multiple Miranda warnings and voluntarily waived his rights). In United States v. Villalba-Alvarado, the Eighth Circuit held that the defendant's statement, which was made after a valid Miranda waiver, did not have to be suppressed merely because it was the fruit of an earlier Miranda violation. 345 F.3d 1007, 1013 (8th Cir. 2003). Rather, the admissibility of the statement required analysis under the voluntariness standard. Id. Lacking argument that the statement was involuntary, the court found that the statement was admissible. Id.

In the present case, while the Court finds that defendant's statement given after multiple Miranda warnings at the ICE offices was voluntary, there is no showing that the fingerprinting was voluntary. Therefore, suppression of defendant's fingerprints and admittance of his statement are reconcilable.

## **RECOMMENDATION**

For the reasons set forth above, it is recommended that:

1.      Defendant Ricardo Aragon-Ruiz's Motion to Suppress [Docket No. 8] be GRANTED in part and DENIED in part.

2.      Defendant Ricardo Aragon-Ruiz's Motion to Dismiss  – Legal Invalidity of Prior Deportation [Docket No. 18] be DENIED.

3.      Defendant Ricardo Aragon-Ruiz's Motion for Court Determination of Prior Conviction [Docket No. 19] be DENIED.


Dated:      January 29, 2008


*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge



Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before **February 15, 2008** a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.