UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 07-341(DSD/JSM)

United States of America,

        Plaintiff,

v.  **ORDER**

Ricardo Aragon-Ruiz,

        Defendant.


This matter is before the court upon the parties' objections to Magistrate Judge Janie S. Mayeron's January 29, 2008, report and recommendation. In her report, the magistrate judge recommends granting in part and denying in part defendant Ricardo Aragon-Ruiz's motion to suppress, and denying defendant's motions to dismiss and for court determination of prior conviction. Following a de novo review of the file and record pursuant to 28 U.S.C. § 636(b)(1)(C), the court adopts in part the report and recommendation of the magistrate judge.

**BACKGROUND**

At 7:45 a.m. on September 18, 2007, eight to ten Immigration and Customs Enforcement ("ICE") agents and a Ramsey County Sheriff's deputy (collectively "agents") attempted to execute a search warrant for Miguel Barrera ("Barrera") - a known immigration fugitive and member of the "Sureno 13" gang - at a house in Columbia Heights, Minnesota. The agents wore raid gear and carried

handguns, and a small number also carried long-arms. Upon arriving, three agents and the deputy moved to a side door while another agent knocked on the front door. The other agents were stationed at each entrance to the house. Emerjido Duena Carmona ("Carmona") - a resident of the house - responded at the side door and upon questioning informed the agents that Barrera resided at the house but was not present. The agents then requested and received Carmona's oral and written consent in Spanish to search the house. During the search, the agents encountered a juvenile male and defendant and placed them in the kitchen with Carmona for security reasons. Nobody was physically restrained at that time.

At the January 8, 2008, hearing, defendant testified that after the agents found him in his bedroom sleeping, they stated that he could leave only after he told them Barrera's location. However, after informing the agents that Barrera was at work, he was not told that he could leave. Moreover, defendant testified that although the agents did not tell him he was under arrest, he did not think he was free to leave and thought he had to answer the agents' questions.

Special Agent Jeffrey Benadum ("Benadum") joined the three individuals and approximately three other agents in the kitchen. Benadum sat down at a table between the juvenile and defendant and asked the juvenile his name, where he was from and what the "1" and "3" tattooed on his hand signified. The juvenile responded that he

2

was from Mexico and that the tattoo referred to "Sureno 13." Benadum then asked defendant for his name, and defendant responded with a name later determined to be false. In response to further questioning by Benadum, defendant indicated that he did not reside in the house and that he did not know his address because he had only lived there for a few days. Defendant also stated that he had a passport and visa at his house.

Around 8:00 a.m., an adult female resident of the house came downstairs and - after telling Benadum that Barrera had left with her husband earlier - asked how long the agents would be in the house because children were arriving shortly for her to babysit. Upon learning this, the agents immediately went to their vehicles with defendant and the juvenile.[1] At this time defendant was not free to leave. (Tr. at 57.[2]) The agents then called for record checks on the names provided by defendant and the juvenile, and after receiving no information on either name, formally arrested them.

The agents placed defendant and the juvenile in a detention van, and Special Agent Patrick Edgar ("Edgar") read them their Miranda rights in English and Spanish. See Miranda v. Arizona, 384

---

[1] Benadum testified that the woman and Carmona were not taken outside because the woman said she was a United States citizen and had matching identification and Carmona produced a valid "green" card.

[2] "Tr." refers to the January 8, 2008, criminal motions hearing transcript.

U.S. 436, 444 (1966). Edgar proceeded to ask defendant several biographical questions and inquired whether he was in the United States lawfully. At no time did defendant object to the questioning or request an attorney.

After being questioned in the van, defendant was transported to an ICE office in Bloomington, Minnesota, and fingerprinted upon arrival. With the fingerprints, Edgar determined defendant's true identity and immigration history. Defendant had previously been removed from the United States pursuant to the expedited procedures set forth in 8 U.S.C. § 1228(b) because of a May 7, 2003, conviction in Minnesota state court of aiding and abetting second degree assault in violation of Minn. Stat. § 609.222, subdiv. 1.

Defendant remained detained at the ICE office and was later questioned by Special Agents Frank Hunter ("Hunter") and Rocha in the early afternoon. Hunter and Rocha individually advised defendant of his <u>Miranda</u> rights in English and Spanish. Defendant responded to all of the questions in English during the ten to fifteen minute session, and at no time did he object to the questioning or request an attorney.

The government filed a complaint on September 25, 2007, and on October 1, 2007, defendant was indicted on one count of unlawful reentry after removal in violation of 8 U.S.C. § 1326(a) and(b)(2), and 6 U.S.C. §§ 202(3), (4) and 557. On October 2, 2007, defendant moved to suppress all of his statements, admissions and physical

4

evidence - including his fingerprints.  Further, on October 24, 2007, defendant moved to dismiss the proceedings because defendant's earlier removal was legally invalid and moved for a court determination of the status of defendant's second degree assault conviction.  The magistrate judge held a hearing on January 8, 2008, to address the motions.

On January 29, 2008, the magistrate judge issued a report and recommendation granting in part and denying in part defendant's motion to suppress and denying defendant's other two motions.  With respect to the motion to suppress, the magistrate judge recommends suppressing defendant's statements made in the house and the van but not at the ICE office.  In addition, the magistrate judge recommends suppressing defendant's fingerprints.

On January 31, 2008, the United States filed a motion to compel defendant's fingerprint exemplars, which the court granted on February 1, 2008.  Defendant moved for reconsideration of the court's order on February 1, 2008, and on February 4, 2008, moved to suppress defendant's fingerprint exemplars.  The parties' objections to the magistrate judge's report and recommendation followed.

**DISCUSSION**

**I.  Motions to Dismiss and for Determination of Prior Conviction**

The magistrate judge recommends denying defendant's motion to dismiss.  The magistrate judge thoroughly addressed defendant's motion and concluded that 8 U.S.C. § 1326(d) precludes defendant from challenging the validity of his earlier expedited removal because he did not exhaust his administrative remedies, the proceedings did not deny him of the opportunity for judicial review and the entry of the order was not fundamentally unfair.  (R&R at 5-19.[3])  Upon de novo review, the court concurs with the magistrate judge's analysis and adopts her recommendation with respect to the motion to dismiss.  Moreover, the court agrees that because defendant cannot collaterally attack his prior removal, whether his assault conviction is an "aggravated felony" is properly determined if and when he is sentenced.  Therefore, the court adopts the magistrate judge's recommendation to that effect and disregards her alternative conclusion that defendant's conviction is an "aggravated felony."  (R&R at 19-22.)  Accordingly, defendant's objections are overruled.

**II.  Motion to Suppress**

In her report and recommendation, the magistrate judge found that Carmona validly consented to a search of the house.  However,

---

[3] "R&R" refers to the magistrate judge's January 29, 2008, "Report and Recommendation."

the magistrate judge concluded that defendant was subject to unlawful custodial interrogation while in the kitchen and recommends suppression of those statements. (R&R at 30-43.) Moreover, the magistrate judge determined that defendant's arrest was not supported by probable cause and that his statements in the van should be suppressed because they were "not sufficiently attenuated from the illegal arrest." (Id. at 45.) The magistrate judge also recommends suppressing defendant's fingerprints because they were "obtained during the unlawful detention and ... were taken in whole or in part for an investigative purpose, and not just to confirm [defendant's] identity." (Id. at 52.) As to defendant's response to Hunter's questioning, the magistrate judge recommends that the statements not be suppressed because they were voluntary and "sufficiently attenuated from [defendant's] illegal detention." (Id. at 45.) The United States objects to the magistrate judge's recommendations that defendant's first two statements and his fingerprints be suppressed. Defendant objects to the magistrate judge's recommendation that his statements at the ICE office not be suppressed.

  A. **Miranda Violation**

An individual subject to custodial interrogation must be given Miranda warnings, otherwise the statements made during the interrogation are inadmissible at trial. See United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004) (citing Dickerson v.

7

United States, 530 U.S. 428, 435 (2000)). The magistrate judge concluded that Benadum interrogated defendant while he was in custody. The government argues that defendant was not in custody.

While conducting a valid search, law enforcement officials may temporarily detain individuals found on the premises. See Michigan v. Summers, 452 U.S. 692, 704-05 (1981) (detention during execution of search warrant); United States v. Hernandez-Hernandez, 327 F.3d 703, 706 (8th Cir. 2003) (detention during consensual search); see also United States v. Wallace, 323 F.3d 1109, 1111 (8th Cir. 2003). Such detention, however, constitutes custody if "a reasonable person in [defendant's] position would [not feel] at liberty to end the interrogation and leave." United States v. Brave Heart, 397 F.3d 1035, 1038-39 (8th Cir. 2005) (citations omitted). A court looks at the totality of the circumstances at the time of questioning to determine whether a defendant was in custody. United States v. Czichray, 378 F.3d 822, 826 (8th Cir. 2004) (citing United States v. Axsom, 289 F.3d 496, 500 (8th Cir. 2002)). The following factors aid a court in its analysis:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning;

>        (5) whether the atmosphere of the questioning
>        was police dominated; or, (6) whether the
>        suspect was placed under arrest at the
>        termination of the questioning.

United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990).  If present, the first three factors "mitigate against the existence of custody at the time of questioning.  Conversely, the last three ... factors ... if present, aggravate the existence of custody." Axsom, 289 F.3d at 500-01.  These factors, however, are non-exhaustive and are not to be mechanically and rigidly applied. Czichary, 378 F.3d at 827.  Rather, the ultimate inquiry remains "'whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'"  Id. at 826 (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). Defendant does not challenge the legality of his initial detention but rather argues that the facts in this case establish that he was in custody.

This case presents multiple mitigating and aggravating factors.  On one hand, ICE agents awakened defendant, told him that they needed to speak with him and detained him in the kitchen.  The agents never informed defendant that he was free to leave or that he did not have to answer their questions.  Rather, the agents told defendant that he could leave only after disclosing Barrera's whereabouts.  However, after telling them that Barrera was at work, nobody told defendant he could leave.  Moreover, there were nine to eleven law enforcement officials in raid gear with firearms on the

premises, all entrances and exits were secured and law enforcement officials were with defendant throughout the incident. Further, four agents were present in the kitchen when Benadum questioned defendant, and defendant was formally arrested soon thereafter.

On the other hand, the questioning was short and routine, and defendant was not placed in handcuffs or otherwise physically restrained. Defendant was questioned at his residence and in the presence of two to three individuals with whom he lived, and there is no evidence that law enforcement officials used strong arm tactics or deceptive stratagem. Further, the actions of the woman questioning the agents' presence and the agents' rapid departure in response suggest that a reasonable person in defendant's situation would have felt at liberty to end the questioning and leave.

Faced with these conflicting factors, the United States argues that Hernandez-Hernandez is dispositive. In Hernandez-Hernandez, a Drug Enforcement Administration taskforce received information about an individual distributing drugs and firearms from his home. 327 F.3d at 705. After identifying an individual outside of a home matching the description of the suspect, a team of nine law enforcement officials from various agencies went to the home. The officials encountered three individuals - one of whom was Hernandez-Hernandez - in the front yard, and after frisking them for weapons told them to take a seat. The individuals were not otherwise physically restrained. While other officials were

conducting a consent search of the premises, an Immigration and Naturalization Service ("INS") agent identified himself and asked Hernandez-Hernandez several questions - including his country of citizenship, his name, whether he had identification, whether he had papers to be in the country legally and whether he was in the country illegally.  The agent arrested Hernandez-Hernandez after he admitted that he was in the country illegally.  It was later determined that Hernandez-Hernandez had provided a false name and identification to the INS agent, and he was eventually charged with illegal reentry.  Independent of whether the law enforcement officials had reasonable suspicion to temporarily detain Hernandez-Hernandez, the court concluded without analysis that he was not in custody because, "[a]lthough the agents briefly detained [him] at his home while conducting the consensual search, the facts do not show they restrained him to a degree associated with formal arrest."  Id. at 706.

Similarly, in this case agents formally arrested defendant after questioning him while he was detained with others at his place of residence during a consensual search by several law enforcement officials.  However, there are two important differences between Hernandez-Hernandez and this case.  First, the agents told defendant that he had to answer some questions, thus suggesting that he did not have the right to leave.  Second, defendant was in a confined space surrounded by four armed law

11

enforcement officials and all entrances and exits were secured by other officials. The court determines that these distinctions establish that defendant's freedom of movement was restrained to a degree associated with formal arrest. Therefore, the court adopts the magistrate judge's recommendation on this issue. Accordingly, defendant's responses to Benadum's questioning are inadmissible at trial.

### B. Probable Cause to Arrest

The magistrate judge concluded that the agents lacked probable cause to arrest defendant. (R&R at 43.) In reaching this conclusion, the magistrate judge did not consider defendant's statements in the kitchen because of the Miranda violation. (Id. at 42.) The Eighth Circuit has not determined whether a court may consider statements made in violation of Miranda in determining probable cause.[4] See United States v. Caves, 890 F.2d 87, 91 n.3 (8th Cir. 1989) ("We also do not decide whether, even if [defendant's] statements were elicited in violation of Miranda,

---

[4] The magistrate judge found dispositive United States v. Flores-Sandoval, 422 F.3d 711 (8th Cir. 2005). (R&R at 40-43.) In that case, however, the court determined that Flores-Sandoval was unlawfully detained at the time he told law enforcement officials that he was in the country illegally. Id. at 714. Because of Flores-Sandoval's unlawful detention and the absence of any circumstances purging the taint of that detention - such as Miranda warnings - the court prohibited use of his statement to establish a proper basis for custody. Id. Here, defendant was properly detained pending the consent search at the time of Benadum's questioning. The issue is whether, despite the Miranda violation, defendant's statements to Benadum can be used to establish probable cause for his later arrest.

those statements could nevertheless be considered in establishing probable cause.").

"Whether the exclusionary rule applies to evidence acquired subsequent to a constitutional violation requires consideration of the possible admissibility of the evidence in light of the distinct policies and interests of each Amendment." United States v. Fellers, 397 F.3d 1090, 1094 (8th Cir. 2005) (citations and quotations omitted). Therefore, the court's "task is to decide how sweeping the judicially imposed consequences of a failure to administer Miranda warnings should be when the probable cause to arrest derives from an inadmissible pre-arrest statement." United States v. Morales, 788 F.2d 883, 885-86 (2d Cir. 1986) (citations and quotations omitted).

The "core protection afforded by the [Fifth Amendment's] Self-Incrimination Clause is a prohibition on compelling a criminal defendant to testify against himself at trial." United States v. Patane, 542 U.S. 630, 637 (2004) (plurality opinion) (citations omitted). Confessions or statements obtained in violation of Miranda are presumed compelled and are thus inadmissible at trial. Fellers, 397 F.3d at 1095. "This presumption of compulsion, however, does not bar the use of unwarned statements for impeachment purposes," nor does it "preclude the introduction of a subsequent warned statement at trial." Id. at 1095 (citing Oregon v. Elstad, 470 U.S. 298, 310-11 (1985)). Moreover, the presumption

13

does not "require[] suppression of the physical fruits of [a] suspect's unwarned but voluntary statements." Patane, 542 U.S. at 633. Such circumstances do not require exclusion because they do not raise the risk that compelled testimony will be used against a defendant at trial. Cf. Fellers, 397 F.3d at 1095. Likewise, in the absence of "trickery or coercion, there is no justification for requiring a police officer to ignore incriminating admissions in arriving at a conclusion that there is probable cause for an arrest." Morales, 788 F.2d at 886; cf. United States v. Patterson, 812 F.2d 1188, 1193 (9th Cir. 1987) (statements taken in violation of Miranda can be used in affidavit establishing probable cause to search). In other words, prohibiting consideration of a defendant's pre-Miranda statements in determining probable cause does not further protect a defendant's right to be free from compelled testimony at trial. Rather, suppression of the statement at trial provides adequate protection. In this case, because there is no evidence of trickery or coercion by Benadum or the other agents, the court considers defendant's pre-Miranda statements in determining whether the agents had probable cause at the time of his arrest.

Here, the agents were authorized without a warrant "to arrest any alien in the United States, if [they had] reason to believe that the alien so arrested is in the United States in violation of any [law or regulation made in pursuance of law regulating the

14

admission, exclusion, expulsion or removal of aliens] and is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2) (emphasis added).  In this context, "'reason to believe' is the equivalent of probable cause." United States v. Sanchez, 635 F.2d 47, 63 (2d Cir. 1980) (citing Au Yi Lau v. Immigration & Naturalization Serv., 445 F.2d 217, 222 (D.C. Cir. 1971)); see also United States v. Varkonyi, 645 F.2d 453, 458 (5th Cir. 1981); Lee v. Immigration & Naturalization Serv., 590 F.2d 497, 499-500 (3d Cir. 1979).  Probable cause exists "when the facts and circumstances are sufficient to lead a reasonable person to believe that [a] defendant has committed or is committing an offense."  United States v. Torres-Lona, 491 F.3d 750, 755 (8th Cir. 2007) (citing Beck v. Ohio, 379 U.S. 89, 91 (1964)).  There need only be a "probability or substantial chance of criminal activity, rather than an actual showing of criminal activity." Id. (citation and quotation omitted).  Moreover, "[i]n determining probable cause, law enforcement officers may draw inferences based upon their experience." United States v. Cortez-Palomino, 438 F.3d 910, 913 (8th Cir. 2006) (citing Ornelas v. United States, 517 U.S. 690, 700 (1996); Caves, 890 F.2d at 90).

In this case, although not formally arrested, defendant was taken into custody and not free to leave at the time the agents vacated the house.  At that time, the agents knew that defendant was an acquaintance of a known immigration fugitive.  Moreover,

based on their experience, the agents could properly infer that defendant's responses to Benadum's questions - that his passport and visa were apparently at his house, but that he did not know the location of his house - were unbelievable.  Based upon this information, the agents were authorized to arrest defendant because they had "reason to believe" that he was in the country illegally.[5]  Cf. Sanchez, 635 F.2d at 63 ("[Defendant's] failure to produce any of the required documentation and his inability to give any details whatever as to his status justified ... placing him under arrest.").[6]  Therefore, the court determines that defendant was legally detained.  Moreover, because Edgar read and defendant waived his Miranda rights before the questioning in the van, the court determines that defendant's statements in the van are admissible.  Similarly, defendant's statements at the ICE office are admissible because he again heard and waived his Miranda rights twice - in English and Spanish each time.  Finally, because defendant was lawfully detained, the fingerprints taken at the ICE

---

[5] The United States argues that defendant was not arrested until after the records check returned with no information on the name provided by defendant.  Because the court determines that the agents had probable cause to arrest defendant without the records check, it assumes that defendant was arrested when the agents removed him from the house.

[6] Significantly, Carmona and the woman were not arrested because they produced valid identification.

office are also admissible.[7]  Cf. United States v. Guevara-Martinez, 262 F.3d 751, 756 (8th Cir. 2001) (fingerprints suppressed because detention was unlawful).  Accordingly, the court sustains the United States' objections and overrules defendant's objection.

## CONCLUSION

Following a de novo review of the file and record, the court adopts in part the report and recommendation of the magistrate judge [Docket No. 41].  Therefore, **IT IS HEREBY ORDERED** that:

1.  Defendant's motion to suppress [Doc. No. 8] is denied.

2.  Defendant's motion to dismiss [Doc. No. 18] is denied.

3.  Defendant's motion for determination of status of prior conviction [Doc. No. 19] is denied.

4.  Defendant's motion for reconsideration [Doc. No. 44] is denied as moot.

5.  Defendant's motion to suppress fingerprint exemplars [Doc. No. 45] is denied as moot.

Dated:  March 14, 2008

                                              s/David S. Doty
                                              David S. Doty, Judge
                                              United States District Court

---

[7] This conclusion renders moot defendant's motion for reconsideration of the court's order granting the United States' motion to compel fingerprint exemplars and defendant's motion to suppress those fingerprint exemplars.